## Barton v. Barton's Admr, et al.

(Decided February 28, 1911,)

### Appeal from Bourbon Circuit Court.

1. Bills and Notes—Action on Note—Consideration—Fraudulent Purpose.—This is an action by a son, Virgil Barton, against his father, Joshua Barton's administrator, to recover on a note held by him against his father for $8,000 which he claimed his father gave him for work and for managing his farm for eight years prior to his death at $1,000 per year. Held, the evidence shows the note was executed when Joshua Barton was in embarrassed circumstances, and there was more evidence to the effect that it was executed or the purpose of giving the members of the family of the decedent an advantage over his creditors than there was to support the issue submitted to the jury. The note stated that the consideration was for eight years' service from 1898 to 1906, which would make $1,000 per year, and besides this appellant was furnished with food supplies for himself and family. If appellant worked the farm or a part of the crops until 1906, as shown by the testimony, the note was given without any consideration.

2. Common Law Issue—Trial by Jury.—Appellant has no right to complain because the case was transferred from the equity to the common law docket to be tried by a jury. It was done on his

motion. The exceptions to the report of the commissioner allowing the note raised a common law issue which should have been tried by a jury, which was done.

MORGAN & DARRAH and EMMETT M. DICKSON for appellant.

ROBERT B. FRANKLIN, TALBOTT & WHITLEY and CHAS. A. McMILLAN for appellees.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

One Joshua Barton died in the year 1908 at the age of seventy-four years, and left surviving him his wife, three boys and two girls, all of whom were over twenty-one years of age at the time of his death. Barton owned about seven hundred and sixty acres of land worth about $70 an acre; he was an extensive farmer and stock raiser; he had from forty to forty-five horses, about seventy-five head of Durham cattle, all pedigreed. Barton owed at the time of his death forty or fifty thousand dollars which was secured by mortgages on his land and most of his stock. This action was brought by his administrator, widow, two daughters and two of his sons against Virgil L. Barton, his other son, and his creditors for a settlement of the estate. A reference was made to the master commissioner to take proof of claims against the estate, and appellant, Virgil L. Barton, filed three, one a note for $500, which is as follows:

"$500.00.                 Apr. 7th, 1905.

"One day after date I promise to pay V. L. Barton or order five hundred dollars for his improvements on my farm if I give him the land these improvements are on, this note is null and void. Value received, negotiable and payable at Millersburg Deposit Bank. Otherwise this note stands good for the amount mentioned.

                             "JOSHUA BARTON."

Another one of the claims fileed by him was an account for labor performed for Joshua Barton from April 7, 1906, to August 7, 1908, at $1,000 per year, amounting to $2,333.33. The third claim was a note for $8,000, and is as follows:

"$8,000.00.         Cynthiana, Ky., Apr. 7th, 1906.

One day after date I promise to pay to the order of V. L. Barton at the National Bank of Cynthiana, for value received, eight thousand dollars, with five per cent. interest from date until paid. The payee and all subse-

quent endorsers waive demand, protest, notice of protest, and all legal diligence to enforce the collection of this note.

"For attending & running JOSHUA BARTON."
the farm for eight years."

The commissioner filed his report allowing these claims, and appellees filed exceptions to the claim for $8,000, which are as follows:

"1. They have no knowledge or information sufficient to form a belief whether decedent either signed or delivered said note, and they require proof thereof.

"2. If the decedent did sign and deliver said note, there was no consideration therefor.

"3. If the decedent did sign and deliver said note, the decedent was not in fact indebted to the payee, and the execution thereof was procured by the exercise of undue influence over the payor by the payee.

"4. The decedent was, at the time the said note bears date, very much involved financially, and anticipated bankruptcy or an assignment, and was old and broken in health, and the payee young and vigorous and his son. And if the decedent did sign and deliver said note, the payee, his son, procured the execution of said note by the exercise of undue influence over the maker, in encouraging the parental instincts of the maker to provide for the maker's wife and children, even as against creditors, and encouraging and leading the maker to believe that his estate, to the extent of said note, could be thereby saved to the maker's family, including the said payee, his son.

"5. Because, if the decedent did sign and deliver said note, the payee, by the exercise of undue influence over the payor, induced the payor to execute such note for the purpose, and with the object of saving that much of the maker's estate for the benefit of the maker's family, including the payee, his son, and the payee is now, contrary to such secret trust, undertaking to enforce the said note for his own personal benefit as a debt against the estate, and against the widow and other children of the decedent, when the maker was not in fact indebted to him. And the payment of said note as a debt, would be gross injustice to the widow and other children of the decedent."

Appellees withdrew the first exception and filed in lieu thereof the following:

"1. Either the decedent delivered the note for $8,000 to his son, V. L. Barton, for the purpose of borrowing money for the decedent, and for no other purpose, and the same was not used for the purpose for which it was intended.

"2. Or, the facts set out in the exceptions 2, 3, 4 and 5, filed March 19th, 1909, were and are true."

After the above exceptions were filed, appellees also filed exceptions to the account for $2,333, but they were not litigated in this action. On March 23, 1909, appellant, Virgil L. Barton, moved the court to grant an issue out of chancery to try the questions of fact raised by the exceptions filed to the master commissioner's report allowing the $8,000 note. Appellees objected and excepted to this order and afterwards moved the court to set it aside and grant them a trial of the issues in equity, which the court refused to do and appellees excepted. The parties entered into a trial of the case; the evidence was heard and the jury, upon the instructions of the court, found against the note. At the conclusion of the evidence the court made an oral statement to the jury telling them, in effect, that the first exception filed by appellees had been withdrawn and that they would, therefore, consider no evidence with reference thereto, and that the exceptions filed in lieu thereto to the effect that Joshua Barton had issued this note for the purpose of borrowing money and for no other, was not supported by any evidence and should not be considered. The court further told the jury that it should not consider exception number five, which was to the effect that the note was executed for the purpose of providing for the family as against other creditors, as there was no proof upon that issue. The court then gave the jury, upon its own motion, the following instructions:

"A. You are instructed to find for defendant, Virgil L. Barton, the sum of eight thousand ($8,000) dollars, with interest thereon at five per cent per annum from the 7th day of April, 1906, until paid, the amount claimed by him on the note in controversy, unless, however, you believe from the evidence that at the time said note was signed and delivered by the decedent, Joshua Barton, that the same was so signed and delivered by him without any consideration therefor, and the meaning of the words, 'without any consideration,' as applies in this case, is as follows: If you believe from the evidence

that at the time the said note was signed and delivered, that the decedent, Joshua Barton, was not indebted to the defendant, Virgil L. Barton, for any amount for services which he claims to have rendered, and that he was under no obligation to pay any sum whatever for work and labor and services claimed to have been rendered, then the defendant will take nothing under said note, and your verdict shall be for the plaintiffs.

"If, however, you believe from the evidence that the defendant, Virgil L. Barton, rendered any services to the decedent, Joshua Barton, within the period of eight years prior to the making of said note in the way of attending and running the farm and caring for the stock, for which said decedent, Joshua Barton, had, by contract, expressed or implied, agreed to compensate him, then you will find for the defendant, the full amount of the note, as stated by the first paragraph of this instruction.

"B. If the jury believe from the evidence that at the time the said note was signed and delivered to the defendant, Virgil L. Barton, the said decedent, Joshua Barton, was induced to sign and deliver the same to the said Virgil Barton by the exercise then and there of undue influence upon him upon the part of the defendant, Virgil L. Barton, and that but for said undue influence he would not have signed and delivered the same, then you will find for the plaintiffs and against the said Virgil L. Barton.

"Undue influence, as used in these instructions, is defined as follows: The court instructs the jury that influence obtained by modest persuasion and argument addressed to the understanding, or by mere appeals to the affection, can not be properly termed undue influence in a legal sense; but influence obtained by flattery, importunity, threats, superiority of will, mind or character, or by what art soever that human thought, ingenuity or cunning may employ, which would give dominion over the will of the decedent to such extent as to destroy free agency, or constrain him to do against his will what he is unable to refuse, is such an influence as the law condemns as undue, when exercised by any one immediately over the act, whether by direction or indirection, or obtained at one time or another."

Appellant objected to the widow and other children testifying to what Joshua Barton said to him and what he said to Joshua Barton with reference to the issues,

as Joshua Barton was dead and they were heirs of his estate. The court did not permit them to testify as to what Joshua Barton said, unless it was said to or in the presence and hearing of appellant. This was clearly competent under the Code and all the authorities with reference thereto, and we deem it unnecessary to cite them. This being so, appellant had a right to testify to any statement or conversation with Joshua Barton which was testified to by appellees. The court, however, did not confine him to these statements, but permitted him to tell other conversations had with his father and all about the execution, and delivery of the note when no one was present except appellant and his father. This was error, but it was in favor of appellant. Subsection 2 of section 606 of the Civil Code, provides:

"Subject to the provisions of subsection 7 of this section, no person shall testify for himself concerning any verbal statement of, or any transaction with, or any act done or omitted to be done by * * * one who is dead when the testimony is offered to be given except for the purpose, and to the extent, of affecting one who is living, and who, when over fourteen years of age and of sound mind, heard such statement, or was present when such transaction took place, or when such act was done or omitted, unless—

"C. The decedent, or a representative of, or some one interested in, his estate, shall have testified against such person, with reference thereto."

Many decisions of this State might be cited sustaining this position, but the Code is so explicit it needs no construction.

Appellant testified that prior to 1900 he and his brother, Frank, raised crops of corn on the farm on the shares; that they gave their father one-half at the time of division; that he and his brother took one-fourth each; that at the beginning of 1900 his father made a proposition to him and the other boys wherein he stated that he was indebted and as he was old he was unable to pay out; that if they would stay on the farm he would furnish them with everything to live upon if they would work for $150 or $200 a year which would enable him to pay off his indebtedness and leave the property for them and their sisters. Appellant stated that he accepted this proposition but his brothers did not; that he worked under this arrangement for two years and was making

arrangements at the end thereof to move to Indiana and take charge of a farm for a man by the name of Vose who had agreed to furnish him a home for himself and family and all the supplies raised on the farm that he needed and to give him $500 a year for managing the farm; that upon his return from that State and after telling his father what he had been offered, that he told him that he could not get along without him upon the farm, and that if he would stay with him he would do a better part by him than Vose. Appellant testified that he told his father that if he would do that he would remain with him; that he did stay upon the farm with this understanding until his father's death in 1908; that he took charge of the horses, cattle, hogs and sheep and gave them particular attention; that he managed and helped to raise the crops; that he did not raise any corn after that on the shares, except one year, about 1905, he raised about eighty acres of corn. He further testified that late in the afternoon of April 6, 1906, his father was driving home by his house and he went out and got into the buggy with him and drove two or three hundred yards to his father's barn; that while they were on their way he reminded his father that he had promised to arrange with him for his work and do a better part by him than Vose offered to do, and that death was certain and life uncertain; that his father replied, "blame it, I will fix it tonight;" that the words, "blame it" were by-words of his father's; that on the following morning, April 7th, he saw some one coming towards his house and he stepped out of the door to see who it was and he met his father who handed him a paper, the $8,000 note, and told him to read it and see if it would satisfy him. He stated that he read the paper and told his father it was all right if it was written right and his father said it was; that about an hour after he received the paper a man by the name of Kennedy was passing by and he showed it to him and Kennedy said he wished he had not seen it. This was all appellant testified to with reference to the note. Appellees agree with appellant as to his raising crops on the shares prior to 1900, and as to his working for $150 or $200 and provisions for himself and family during the years 1900 and 1901, and as to his becoming dissatisfied with his contract and attempting to make arrangements with somebody in Indiana. But appellees testified that:

upon appellant's return from Indiana he said that he did not like up there and was not going back; that he had rather work the farm at home on the shares and after that he did work on the shares. Appellant testified that his father had one or two public sales every year; that he took charge of the stock and prepared it for sale and performed services at all the sales. There is not much controversy about this, but the brothers say that they also aided at the sales. One of the appellant's witnesses, Dr. Righter, says that at about the time appellant was leaving for Indiana, or while he was there, he heard Joshua Barton say that he could not get along very well on the farm without Virgil and that he was afraid that his, Virgil's, father-in-law and mother-in-law were influencing him to leave; that after Virgil's return he asked Joshua Barton if Virgil was going to stay with him and he answered that he had fixed or satisfied Virgil and that he was going to stay. Appellees testified that soon after the burial of their father they met in Judge Stitt's office in Paris, Ky., for the purpose of agreeing on some one to act as administrator; that while there, appellant being present, they all tried to see to what extent the estate was indebted and each one gave in all the claims against it that they could think of, but appellant did not mention at that time the $8,000 note. They met again, four or five days later, at the old home place, and some of them, during the meantime, had heard of this $8,000 note and they asked Virgil if he had it and if he was going to present it, and he said "yes," he reckoned he would. One of his brothers then said to him that he ought not to, because he knew there were other notes of the same kind out which had been executed by his father. The court sustained an objection to this statement as to there being other notes of the same kind in the hands of the children, and no proof of this character was afterwards introduced or offered to be introduced. Appellee introduced the clerk of the county court and showed that Joshua Barton's mortgaged indebtedness in 1906 amounted to thirty-five or forty thousand dollars, and the sheriff showed four or five thousand dollars worth of unsettled executions in the early part of 1906, against Joshua Barton. Appellees also introduced the cashier of a bank in Paris who testified that the bank had loaned Joshua Barton four or five thousand dollars with which to pay off the judgments, or

executions; that the loan was made for six months; that it was hard for Joshua Barton to obtain a loan on account of the previous mortgages covering all that he had and that the bank made the loan upon the following conditions: That is, Joshua Barton was to draw up a deed of assignment making the cashier of this bank his assignee, execute it and leave it with the cashier to be filed of record in the county court clerk's office if he failed to pay the amount borrowed at the end of the six months. The six months expired about the time the $8,000 note was executed and delivered. There was a great deal of testimony to the effect that appellant made a valuable hand upon his father's farm and much to the effect that he continued to work on the farm as he had been in the habit of doing. All the witnesses who testified upon the subject, agree that Joshua Barton was active in the control and management of his farm; that he rode horseback over it most every day and directed the work thereon, until his last illness in 1908.

Appellees introduced a book kept by Joshua Barton. The book is not before us, but there is what purports to be a copy in the record of all that the book contained relative to the issues. Appellant testified that his father paid him only $100 during the two years he worked for $150 or $200 a year. The book contradicts this statement, and there seems to be no doubt but what Joshua Barton kept the book and that the entries are in his handwriting. Appellant's counsel objected to this book being introduced and refer to the cases of Montgomery County v. Bean, et al., 26 Ky. Law Rep., 568; 82 S. W., 240, and Little v. Berry, 113 S. W., 902, as sustaining their position that it was incompetent evidence. The book referred to in the case of Montgomery County v. Bean, et al., was introduced to show a payment by the treasurer on a lot and the court decided that it was not admissible to show an absolute sale of the lot by B to the company. The one referred to in the case of Little v. Berry, did not purport to be a book of accounts against individuals, but was only a memoranda of certain transactions by the owner as he noted them in the book, and the court decided that the owner of that book could not introduce it as original entries; that it was not the kind of book authorized to be introduced as evidence. The book introduced in the case at bar, it is true, is a small one but it is shown to be the only one kept by Joshua

Barton at that time and the entries are accounts made therein by himself against all the hands who worked on the farm at that time. In our opinion, this was a "shopkeeper's book" in the meaning of the language used in the last opinion referred to and was competent evidence. Appellant should have been permitted, after it was introduced, to explain it the best he could, which was done and he simply stated that he knew nothing of the transactions set forth in the book.

There was very little testimony tending to show undue influence on appellant's part in obtaining the note, but this, as well as the issue of no consideration, was succinctly and properly submitted to the jury.

In our opinion, there was more evidence to the effect that Joshua Barton executed and delivered this note for the purpose of giving the members of his family an advantage over his creditors, than there was evidence to support the two issues submitted to the jury. The testimony shows that the note was executed at a time when Joshua Barton was in embarrassed circumstances and at about the time the assignment which he had already executed was to take effect, but the failure to submit this issue was not prejudicial to appellant but to appellees.

The note stated that the consideration for it was eight years' service, from 1898 to 1906, which would make $1,000 per year, and besides this, appellant was furnished with food supplies for himself and family. But few farmers could pay such a price, this fact of itself is suspicious, and, besides, the note was executed for $1,000 for three years as all agree that for 1908 and 1909 appellant worked upon the farm with his brother for a part of the crops and for 1900 and 1901 he worked under a contract price of $150 or $200 a year. We cannot understand why Joshua Barton would execute a note agreeing to pay three or four thousand dollars for these years, unless, as stated, he wanted to give his children an advantage over his creditors. If appellant worked on the farm for a part of the crops until 1906, as shown by appellees' testimony, the note was given without any consideration.

Appellant has no right to complain because this case was transferred from the equity to the ordinary docket in the lower court to be tried by a jury. It was done upon his motion; the order was made over the objection of

appellees, and, besides, the exceptions to the report allowing the note raised a common law issue, which should have been tried by a jury, as was done.

There being no error prejudicial to the substantial rights of appellant, the judgment is affirmed.